Gen. 21] 21

## CIVIL RIGHTS AND DISCRIMINATION

### HOUSING – ZONING – EFFECT ON STATE AND LOCAL LAW OF *CITY OF EDMONDS V. OXFORD HOUSE, INC.*

August 4, 1995

*The Honorable Samuel I. Rosenberg*
*House of Delegates*

You have requested our opinion concerning the effect of *City of Edmonds v. Oxford House, Inc.*, 115 S.Ct. 1776 (1995), on State and local statutes, ordinances, or regulations regarding the placement of group homes for individuals with disabilities.

In our opinion, *City of Edmonds* itself has no effect on any State or local statute, ordinance, or regulation. However, the case foreshadows the next wave of Fair Housing Act litigation, and these future cases may well disallow efforts by local governments to impose a fixed ceiling on the number of occupants in group homes for individuals with disabilities.

## I

### *City of Edmonds*

### A. *The Edmonds Zoning Ordinance*

Like many cities in Maryland and elsewhere, the City of Edmonds, Washington, defined in its zoning code the term "family," for purposes of permissible occupancy of dwelling units in a neighborhood zoned for single-family residences. Under this family composition rule, any number of people who were related by genetics, adoption, or marriage could live in a single-family dwelling unit. However, under the zoning code's definition of "family," no more than five unrelated people could live in a single-family dwelling.

If this restriction were lawful, it would have the effect of precluding large group homes from single-family residential neighborhoods in Edmonds. One such home was operated by Oxford House. The home housed ten to twelve adults recovering from alcoholism and drug addiction. According to Oxford House, the group home had to have many more than five residents if it was to be "financially and therapeutically viable." 115 S.Ct. at 1779.

Edmonds' effort to enforce the zoning restriction resulted in a suit in federal court. The issue was whether the zoning code restriction on unrelated people living in a single-family residence violated the Fair Housing Act.

## B.    The Fair Housing Act

The Fair Housing Act, as amended in 1968, prohibits discrimination in housing against people with disabilities. The Act declares it unlawful "[t]o discriminate in the sale or rental, or to otherwise make it unavailable or deny, a dwelling to any buyer or renter because of a handicap of ... that buyer or a renter." 42 U.S.C. §3604(f)(1)(A).[1] One form of discrimination prohibited by the Act is "a refusal to make reasonable accommodations in rules, policies, policies, practices, or services, when such accommodations may be necessary to afford [people with disabilities] equal opportunity to use and enjoy a dwelling." 42 U.S.C. §3604(f)(3)(B). This "reasonable accommodation" requirement of the Act was the heart of Oxford House's case: that Edmonds' insistence on applying its family composition rule, and its consequent failure to grant permission for the group home, was a failure to make a "reasonable accommodation."[2]

Edmonds, seeking to defend this aspect of its zoning ordinance, pointed to an exemption in the Act for "any reasonable, local, state, or federal restrictions regarding the maximum number of occupants

---

[1] The parties in the *City of Edmonds* stipulated that the recovering alcoholics and drug addicts who lived in the group home were "handicapped" individuals within the meaning of the Act. 115 S.Ct. at 1779. *See* 42 U.S.C. §3602(h).

[2] The same claim was made in a separate action by the United States Justice Department. Ultimately the claims were consolidated. *See Edmonds v. Washington State Building Code Council*, 18 F.3d 802 (1994).

permitted to occupy a dwelling." 42 U.S.C. §3607(b)(1). Edmonds argued that, because its definition of "family" limited to five the number of unrelated people who live in a single-family residence, the provision met the terms of this exemption from the Act.

The district court agreed with Edmonds; it held that the definition of "family" was exempt from the Fair Housing Act because it was a "reasonable ... restrictio[n] regarding the maximum number of occupants permitted to occupy a building." The district court's holding was consistent with that of a prior decision of the Eleventh Circuit. *See Elliott v. Athens*, 960 F.2d 975 (1992).

However, the Ninth Circuit reversed. *Edmonds v. Washington State Building Code Council*, 18 F.3d 802 (1994). It held that Edmonds' definition of "family," and hence its restriction on unrelated people living in single-family residences, fell outside of the exemption for maximum occupancy restrictions. The Ninth Circuit remanded the case to the district court for a review of the merits − that is, whether Edmonds' enforcement of the restriction would be a breach of the Act's "reasonable accommodation" requirement.

## C.  *The Supreme Court Decision*

The Supreme Court affirmed the Ninth Circuit's judgment. In so doing, the Supreme Court did *not* determine that Edmonds' restriction on the number of unrelated people who may live in a single-family residence was a violation of the Fair Housing Act. "Like the District Court and the Ninth Circuit, we do not decide whether Edmonds' zoning code provision defining 'family,' as the City would apply it against Oxford House, violates the [Act's] prohibitions against discrimination ...." 115 S.Ct. at 1780 n.4. Rather, the Court's decision was limited to the single issue whether the restriction was exempt from the Act.

The Court drew a distinction between "land use restrictions," which seek to preserve the character of a given area, and "maximum occupancy restrictions," which are intended to "protect health and safety by preventing dwelling overcrowding." 115 S.Ct. at 1781. The Court viewed the Edmonds definition of "family" as the former: "To limit land use to single-family residences, a municipality must define the term 'family'; thus family composition rules are an essential component of single-family residential use restrictions."

*Id.* The Court pointed to a different Edmonds requirement, requiring a minimum amount of floor area for each occupant, as an example of a maximum occupancy restriction. 115 S.Ct. at 1782. Citing the "plain import of the statutory language," as "reinforced" by legislative history, the Court held that the exemption in 42 U.S.C. §3607(b)(1) applied only to maximum occupancy restrictions like Edmonds' floor area requirement. "In sum," the Court wrote, "rules that cap the total number of occupants in order to prevent overcrowding of a dwelling ... fall within §3607(b)(1)'s absolute exemption from the FHA's governance; rules designed to preserve the family character of a neighborhood, fastening on the composition of households rather than on the total number of occupants living quarters can contain, do not." 115 S.Ct. at 1782.[3]

## II

### Effect of *City of Edmonds*

We have not undertaken a comprehensive survey of local zoning ordinances, so we do not know how many contain a definition of "family" comparable to that of Edmonds. However, we assume that such restrictions on occupancy of single-family residences by unrelated people are not uncommon. *See, e.g.,* §155-12 of the Dorchester County Code; §105-5 of the Ocean City Code; §27-107.01(a)(85)(C) of the Prince George's County Code; §164-3 of the Westminster City Code; §ZS1-103 of the Worcester County Code.[4]

*City of Edmonds* means that all provisions of this kind are subject to scrutiny under the Fair Housing Act. None is exempt.

However, such restrictions are not illegal *per se* under the Fair Housing Act. The Supreme Court was careful to emphasize the limits of its holding. Rejecting Edmonds' contention that

---

[3] The Court affirmed by a 6-3 vote. Justice Thomas wrote the dissent for himself and Justices Scalia and Kennedy.

[4] By contrast, some zoning codes contain a definition of "family" that does not differentiate between related and unrelated residents. *See, e.g.,* §270-11 of the Cecil County Code; §68-38 of the Hagerstown City Code.

"subjecting single-family zoning to Fair Housing Act scrutiny will ... 'destroy the effectiveness and purpose of single-family zoning,'" the Court observed that this argument "exaggerates the force of the Act's antidiscrimination provisions.... [These] provisions, when applicable, require only 'reasonable' accommodations to afford persons with handicaps 'equal opportunity to use and enjoy' housing."  115 S.Ct. at 1783.

The "reasonableness" of a local government's decision to enforce a family composition rule will depend on particular facts. The one case squarely on point (predating *City of Edmonds*) held that a city violated the Act by insisting on enforcing its family composition rule against a group home. *Oxford House-C v. City of St. Louis*, 843 F. Supp. 1556 (E.D. Mo. 1994).  The "reasonable accommodation" aspect of the case was undoubtedly colored by evidence of intentional discrimination.  "Instead of reasonable accommodation, ... the City responded with enforcement attempts that demonstrated intentional discrimination." 843 F. Supp. at 1581. On different facts (for example, if a group home proposed to serve an unusually high number of residents), a court conceivably might find considerations related to traffic or parking sufficient to justify exclusion of a large group home from a residential area.  *But see Oxford House-C*, 843 F. Supp. at 1570 ("[S]tudies have ... shown that the presence of group homes has not had an impact on crime, safety, traffic, utilities, noise, or parking.").

With but scant case law exploring the issue left open by the Supreme Court in *City of Edmonds*, we will refrain from any overall conclusion.  However, one thing is certain:  Antipathy toward group homes, grounded in stereotypes about people with disabilities, will *never* be a sufficient justification.  *See, e.g. United States v. City of Taylor*, 872 F. Supp. 423 (E.D. Mich. 1995).  As we observed in one of our several opinions on the Fair Housing Act, the Act makes unlawful governmental requirements "that, on their face or in practical effect, make it harder for people with disabilities to live where they want to."  78 *Opinions of the Attorney General* 48, 57 (1993).[5]

---

[5] Other Fair Housing Act opinions are 78 *Opinions of the Attorney General* 40 (1993); 75 *Opinions of the Attorney General* 291 (1990); and 74 *Opinions of the Attorney General* 164 (1989).

Quite apart from Fair Housing Act considerations, local zoning laws with restrictive family composition rules are already unenforceable with regard to some group homes. Under the Mental Hygiene Law, a "small private group home ... [i]s deemed conclusively a single-family dwelling ... and ... [i]s permitted to locate in all residential zones." §10-518(b) of the Health-General ("HG") Article, Maryland Code.[6]  A similar, and even more expansive, "deeming" provision appears in the Developmental Disabilities Law:

> To avoid discrimination in housing and to afford a natural residential setting, a group home or an alternative living unit for individuals with developmental disability:
>
> (i) Is deemed conclusively a single-family dwelling;
>
> (ii) Is permitted to locate in all residential zones; and
>
> (iii)     May not be subject to any special exception, conditional use permit, or procedure that differs from that required for a single-family dwelling.

HG §7-603(b)(1).[7]

Other group homes are now subject to local family composition rules.  For example, such local restrictions have been enforced against congregate housing for the elderly, for there is no comparable "deeming" provision in State law.  To the contrary, the

---

[6] A "small private group home" serves between four and eight individuals.  HG §10-514(e).  Since a restrictive definition of "family" in a zoning code would ordinarily cap at four or five the number of unrelated people in a residential dwelling, this provision already supersedes such zoning restrictions to a significant extent.

[7] Under the Developmental Disabilities Law, a group home serves between four and eight individuals.  HG §7-101(h).  An alternative living unit serves not more than three individuals.  HG §7-101(d)(1).  Therefore, alternative living units are not affected by the typical family composition rule in a zoning ordinance.

regulations of the Office on Aging expressly require a provider of group sheltered housing for the elderly to verify "compliance with local zoning requirements." COMAR 14.11.07.11. If restrictive family composition rules were ultimately declared unlawful under the Fair Housing Act, presumably providers of these living arrangements for the elderly might be able to locate larger facilities in areas zoned for single-family residences. So, too, would providers of group homes for recovering alcoholics and drug abusers and of some homes serving individuals in need of domiciliary care. *See* COMAR 10.07.03.[8]

## III

### Conclusion

In summary, it is our opinion that *City of Edmonds v. Oxford House* itself leaves intact all existing State and local laws related to the location of group homes. However, the case does mean that family composition rules in local zoning ordinances must be defended on the merits if challenged under the Fair Housing Act, and a locality's decision to enforce such a rule against a group home might well be very difficult to defend successfully.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*

---

[8] State law does not address the zoning status of these facilities.